Dalton LANE, Jr., and Bess L. Lane, Plaintiffs,

v.

Gerald C. UNGER, Ardis E. Unger, Clifford A. Falzone, Hugh Kelly Real Estate Company, The United States of America (FmHA), and Connecticut General Life Insurance Co., Defendants.

No. N81–074C.

United States District Court, E.D. Missouri.

Sept. 25, 1984.

On Motion to Alter or Amend Judgment Nov. 21, 1984.

D. Eric Sowers, Charles, Mo., Gary L. Lewis, Lilbourn, Mo., for plaintiffs.

Daniel T. Rabitt, St. Louis, Mo., Dan Bollow and Cynthia Bitting, Shelbina, Mo., David L. Knight, Columbia, Mo., Robert M. Clayton, Hannibal, Mo., E. Rex Bradley, Louisiana Mo., Klamen & Danna, Joseph Moore, Asst. U.S. Atty., St. Louis, Mo., for defendants.

## MEMORANDUM OPINION

CAHILL, District Judge.

This matter having been tried to the Court, the Court now makes and enters its findings of fact and conclusions of law in support of its judgment.

### Findings of Fact.

1. Plaintiffs Dalton and Bess Lane are citizens and residents of the State of Ohio.

2. Defendants Gerald and Ardis Unger are citizens and residents of the State of Missouri.

3. Defendant attorney Clifford Falzone is a citizen and resident of the State of Missouri.

4. Defendant Hugh Kelly Real Estate Company is a corporation incorporated under the laws of the State of Missouri with its principal place of business in Moberly, Missouri.

5. Defendant Farmers Home Administration (FmHA) is an agency of the United States Government.

6. The amount in controversy, exclusive of interest and costs, exceeds the sum of $10,000.

7. On April 16 and 17, 1981, the Lanes contracted to purchase a 755 acre farm in Monroe County, Missouri, from the Ungers

for $912,000. This contract was contingent upon the Lanes obtaining a tax-free exchange for their 400 acre farm in Ohio. The contract provided that the Lanes would assume a first deed of trust by Connecticut General Life Insurance Company and that the Ungers would carry a $380,000 note secured by a deed of trust at nine (9) percent interest payable over a period of 10 years, with $4,000 payable on the principal each year.

8. Hugh Kelly Real Estate Company served as the selling agents in the Unger/Lane transaction.

9. Attorney Clifford A. Falzone was hired by the Lanes to represent them through the closing of the transaction.

10. Some time after mid-April 1981, the Ungers applied to the FmHA for a loan which would be secured by a second deed of trust on their farm.

11. In early May 1981, Hugh Kelly Real Estate and Falzone learned of the Ungers' loan application. Hugh Kelly Real Estate then directed the Lanes to record their sales contract.

12. The Lanes went to the Office of the Recorder of Deeds but decided against recording their contract. Falzone later advised the Lanes of their options, but then told them that the decision of whether to record was theirs. Both Hugh Kelly Real Estate and Falzone advised the Lanes, however, that if they recorded the contract for sale the FmHA loan may not be approved, and hence the Ungers probably would not go through with the sale. The Lanes did not record their contract.

13. On May 11, 1981, the Ungers and the Lanes entered into a contract for the exchange of the real property. This contract provided for the exchange of lands in Ohio to the Ungers for a portion of the Missouri land and the Ungers' conveyance of two tracts of the Ohio land to other individuals.

14. Subsequently, the Ungers' loan application for $111,950 was approved by the FmHA. On May 14, 1981, the Ungers' second deed of trust to the FmHA was recorded. The Lanes were informed by attorney Falzone that the FmHA deed of trust was recorded.

15. Falzone informed the Lanes that the FmHA deed had a "due on sale clause" which might cause problems. Lawrence Remole, an agent at Hugh Kelly Real Estate, made a few calls and informed the Lanes that the FmHA loan was assumable.

16. The Lanes decided to assume the loan if possible. At that time, attorney Falzone discussed the possibility of obtaining concessions from the Ungers for their having placed a second deed of trust on the property.

17. On May 22, 1981, Vicky Caywood, an agent at Hugh Kelly Real Estate, took the Lanes to the FmHA office in Paris, Missouri. On June 15, 1981, Vicky Caywood and Bess Lane again visited the FmHA offices. Charles Grace, the FmHA Monroe County Supervisor, informed the Lanes that because of their financial position they were ineligible to simply assume the Ungers' note. The Lanes were, however, eligible to assume or refinance the note on different terms. Grace informed the Lanes they could assume the note by making a 10 percent down payment, with the remaining balance being subject to a 13¼ annual percentage rate.

18. The Lanes completed some of the preliminary FmHA forms, but did not complete the entire application process. At the time of closing, the Lanes, knowing that additional forms had to be completed prior to obtaining FmHA approval, closed without approval of the assumption.

19. Prior to or at the time of closing, the Lanes and the Ungers signed an addendum to their contract wherein the Ungers made certain concessions to the Lanes because of the FmHA second deed of trust. The concessions included a reduction in the Ungers' note from $380,000 to $257,577, a reduction in the interest rate from nine (9) percent to seven (7) percent, and a reduction in the annual principal payment from $4,000 to $1,400.

20. On June 26, 1981, the Unger/Lane transaction was closed at the office of Hugh Kelly Real Estate. Present at the closing were the Lanes, three representatives from Spencer Real Estate of Lima, Ohio, the Ungers, and representatives of Hugh Kelly Real Estate. The Ungers executed and delivered to the Lanes a warranty deed conveying the property, which provided that the Lanes would assume both the Connecticut General and FmHA deeds of trust. The Lanes signed and delivered to the Ungers a promissory note for $257,-500 which was secured by a deed of trust to the Ungers.

21. Hugh Kelly Real Estate knowing that the Lanes had not completed the FmHA application went ahead with the closing. Although aware that prior FmHA approval was required for assumption of the second mortgage, both Hugh Kelly Real Estate and attorney Falzone failed to obtain written authority prior to the closing on June 26, 1981. Also, neither Hugh Kelly Real Estate nor attorney Falzone notified the FmHA of the closing. The closing took place late in the evening on June 26, 1981. The Lanes were to complete the FmHA application process on the following business day, but they failed to do so.

22. The Ungers failed to disclose certain obligations to the Lanes at the closing, including outstanding FmHA interest and a payment of $24,230.50 due to Connecticut General in approximately two months. The buyers' statement, signed by the Lanes at the closing, did not refer to any FmHA interest owed and accruing; nor did it refer to $14,672 in interest owed to Connecticut General. This $14,672 was, however, included within the balance of the total amount due to Connecticut General.

23. After the closing, the Lanes took possession of the farm, planted additional crops, and harvested and sold crops. The growing wheat crop was allocated to the Lanes by letter agreement with the Ungers to provide a source of funds for the required ten (10) percent cash payment that was needed to obtain FmHA refinancing of the Unger FmHA loan.

24. The Lanes visited the FmHA office approximately five times and had at least five telephone conversations with the FmHA regarding the assumption. Subsequent to closing the transaction, the Lanes were contacted by Vicky Caywood who urged them to complete the required FmHA documentation for the approval of the assumption. The Lanes failed or refused to complete the FmHA loan assumption process.

25. During late summer and early fall of 1981, there was a general decline in the value and marketability of agricultural lands in the area. Also, the Lanes' crop yield failed to meet their expectations.

26. In September 1981 the Lanes received an unexpected bill for $24,230.50 representing an interest payment due Connecticut General Life Insurance Company. They had expected a bill for about $8,000, which they knew to be due every six months.

27. The Lanes made no payments on the first deed of trust to Connecticut General, the second deed of trust to the FmHA, or the third deed of trust to the Ungers.

28. In September 1981 the Lanes informed FmHA County Supervisor Grace that they did not intend to assume the Ungers' FmHA loan. At that time Grace informed them that he would not recommend approval of the assumption. Until this time there had been no indication that the FmHA would not approve the loan assumption.

29. Approval by the state office of the FmHA was necessary to complete the FmHA loan assumption. The state office of the FmHA never had the opportunity to rule upon the loan assumption because of the Lane's failure to complete the documents necessary to obtain such a ruling.

30. The Lanes advised the Ungers by letter dated November 30, 1981, of their intent to rescind and vacate the property. The Lanes then returned to Ohio in early December.

31. On January 22, 1982, the FmHA gave formal notice to the Ungers of its

intent to foreclose on the second mortgage because the Ungers had sold the property without obtaining the necessary prior written approval. On February 22, 1982, the FmHA provided the Ungers a formal appeal hearing.

32. Subsequently, on February 26, 1982, the Ungers foreclosed on their third deed of trust. The Ungers purchased their own deed for $500.

33. Connecticut General, the holder of the first deed of trust, foreclosed on March 31, 1982. The FmHA bought the farm at this sale.

34. Subsequent to filing this action, the Lanes settled their complaint against the FmHA.

### Conclusions of Law.

1. This Court has diversity jurisdiction of this matter pursuant to 28 U.S.C. § 1332.

2. The law of the state of Missouri governs this diversity action.

3. The Lanes waived any cause of action against the Ungers for their placing a second deed of trust on the property by obtaining concessions from the Ungers therefor in an addendum contract and by closing the transaction with full knowledge of the FmHA second deed.

4. Even if Hugh Kelly Real Estate Company falsely represented that the FmHA loan was automatically assumable, the Lanes could not have reasonably relied on such a statement. Neither was such a representation the proximate cause of the Lane's failure or inability to assume the FmHA mortgage. Under Missouri law, the plaintiffs must prove, *inter alia*, that they have a right to rely on such a statement and that the statement consequently and proximately caused the injury. *Walsh v. Ingersoll-Rand Co.*, 656 F.2d 367 (8th Cir. 1981). There must be causation in fact. *St. Louis U. Trust Co. v. Merrill Lynch*, 562 F.2d 1040 (8th Cir.1977). Although Hugh Kelly Real Estate and attorney Falzone could have taken actions which would have prevented this situation from arising, their acts did not cause the Lanes' failure to assume the FmHA mortgage.

5. The cause for the Lanes' failure or inability to assume the FmHA loan was their refusal to complete the application process. Their delay in completing the application process initially decreased the likelihood of assumption approval. Their subsequent refusal to complete the application process prevented the FmHA from ruling on the assumption.

6. The Lanes have not met their burden of proving that Gerald Unger slandered them. *See, e.g., Brown v. Kitterman*, 443 S.W.2d 146 (Mo.1969).

7. That $24,230.50 was due to Connecticut General in September was a material fact. The test of materiality is objective, not subjective. *Osterberger v. Hites Const. Co.*, 599 S.W.2d 221 (Mo.App. 1980). The Court concludes that this fact would have affected the conduct of a reasonably prudent buyer. Considering that the buyer had to pay roughly $11,000 to the FmHA for an assumption, the Court finds that a reasonably prudent buyer would have altered his conduct in this real estate transaction had he known that an additional $24,230.50 payment was due shortly.

8. The Ungers and their agent Hugh Kelly Real Estate had a duty to disclose this material fact. Although the Lanes were represented by counsel, they dealt directly and frequently with Hugh Kelly Real Estate. The evidence shows that the Lanes relied on Hugh Kelly Real Estate for assistance in this transaction. In this instance, regarding the nature of what was owed and when, the Lanes reasonably relied on Hugh Kelly Real Estate and the Ungers' assertions or lack thereof. The Ungers and Hugh Kelly Real Estate had superior knowledge and due to their partial disclosures, the Lanes were led to believe their representations. Furthermore, a relationship of confidence existed between the parties.

9. The Ungers and Hugh Kelly Real Estate failed to disclose a material obliga-

tion to the Lanes. "Missouri recognizes that fraud may also arise by concealment where one party breaches a duty to disclose certain information to the other." *Slater v. KFC Corp.*, 621 F.2d 932, 936 (8th Cir.1980). The concealment served as a substitute element for an affirmative false misrepresentation. *Osterberger v. Hites Constr. Co.*, 599 S.W.2d at 227. Even if innocently made, this omission will support the remedy of rescission. *Id.*, at 229. Further, the defendants having partially informed the Lanes by including this sum in the total amount owed Connecticut General does not absolve them of liability. Partial information may be as misleading and deceptive as active misrepresentation. *Id.*, at 227; *Schechter v. Brewer*, 344 S.W.2d 784 (Mo.App.1961).

■ 10. The Lanes were falsely induced into the contract by the concealment of this material fact. Under Missouri law, one falsely induced into a contract may either affirm the contract and sue for damages or disaffirm the contract, return the property, and seek restitution of any funds paid for the purchase of the property. *Slater v. KFC Corp.*, 621 F.2d at 935; *Timmons v. Bender*, 601 S.W.2d 688 (Mo.App. 1980). The Lanes informed the Ungers that they were not going through with the deal and returned the property to them.

11. Even assuming that the lack of disclosure by the Ungers and Hugh Kelly Real Estate was negligent, the result is the same. *See Ligon Specialized Hauler, Inc. v. Inland Container Corp.*, 581 S.W.2d 906, 908–09 (Mo.App.1979).

12. The sale and conveyance of the Ungers' farm is rescinded and cancelled. This includes the plaintiffs' promissory notes to General Connecticut and the Ungers, the warranty deed conveying the property, and the deeds securing the promissory notes.

■ 13. The Court has inherent equitable power to shape the remedy so as to render substantial justice between the parties. *See, e.g., Osterberger v. Hites Constr. Co.*, 599 S.W.2d at 229–31 (equity may shape the remedy to meet the de-

mands of justice). In this regard, the Court believes that the Lanes are not entitled to the return of their down payment from the Ungers. The Ungers are entitled to compensation for the Lanes' use of the property from May to December, 1981. The Lanes' down payment sufficiently meets this requirement. Furthermore, the Court feels that the Lanes are not entitled to recover their attorney fees and moving expenses in this matter.

## JUDGMENT

In accordance with the memorandum opinion filed this day and incorporated herein,

**IT IS HEREBY ADJUDGED, DECLARED, AND DECREED** that judgment is entered in favor of the defendants and against the plaintiffs on Counts I, II, III, IV, V, VII, and VIII of the complaint.

**IT IS ADJUDGED, DECLARED, AND DECREED** that judgment is entered in favor of the plaintiffs and against the defendants on Count VI of the complaint, with the exception that no restitution is warranted under the facts of this case.

**IT IS ADJUDGED, DECLARED, AND DECREED** that judgment is entered in favor of the plaintiffs and against defendants Unger on their counterclaim.

**IT IS ORDERED** that the sale and conveyance of the Unger's property to the Lanes is rescinded and vacated.

**IT IS FURTHER ORDERED** that all outstanding motions to dismiss and for directed verdicts, previously stayed by the Court, are **DENIED AS MOOT** in light of this judgment.